v. James Thomson v. Mr. Roehrig Mr. Roehrig, we have divided the arguments in the case in such a way that I will be handling the juror misconduct claim. I would like 15 minutes of time. I'd like to take 12 for the opening and reserve 3 and then Mr. Gunn will take the remaining 5 minutes and argue the rest of the case. In this case, the issue I think is really whether or not it is a jury misconduct error with respect to the McDonough v. Greenwood case and how that played out. In the trial court, there was a finding by the trial judge that juror number 11 had concealed a material fact during the course of the case and that was found to be true. When that was revealed, there was a hearing that the court held. The court found that she had misrepresented a material fact, that she had kept a hidden bias, and that she had misrepresented a material fact. The court at that point in time went ahead and dismissed her as a juror. On appeal, the State Court of Appeal, and then as affirmed by the California Supreme Court, made a determination that there was not error, but the case that they relied upon was the Marshall case. They did not rely upon McDonough v. Greenwood. They went ahead and argued on a State case. Now, the Marshall case related to a matter that involved a juror who had given information into the jury room itself, extraneous information into the jury room. It did not involve the issue that we had here where it is that the juror misrepresented her opinion or her feelings on the critical issue in the case, the death penalty. She was excused. The death penalty, first of all, was not imposed by the jury that ultimately decided it, and she was excused during the period when they decided the issue. Yes, she was excused and she did not sit on the penalty. How would you have been prejudiced on the guilt determination phase? Well, an unfair juror is kind of like the opposite of the right to a fair trial. What you don't know when a juror lies to the court and lies to the parties, who would have been excused for cause had she told the truth, you don't know what occurs during the course of the guilt phase that she was deliberating on. I mean, Justice Kaczynski in the DeVire opinion sets out a number of issues and a number of problems that occur with a juror who has not told the court the truth. In this particular case, she may very well have decided that in her mind she wanted to save the life of Mr. Roeung and the other defendants and lied about her position on the death penalty in order that she could sit on the jury and then ultimately make a decision. That would favor the defendants in terms of penalty. But she could have hung the guilt phase jury by simply refusing to change a vote for innocence, could she not? She could have. And the jury deliberations were long. They lasted 13 days, which is a pretty extraordinary length of time. I understand, but I have the same concern that Judge Korman has, and that is that how was the defense prejudiced where her bias, if she had one, was in favor of the defense, not to impose the death penalty. And I think what you're asking us to do is to overturn the determination by the trial court and the district court of appeal that because she may have engaged in misconduct with regard to the death penalty, she may not be able to impose the death penalty. And I'm not sure how she was able to do that.  I'm not sure how she was able to do that. She may have had the opinion because of the 13 days of deliberations that some of these crimes, or all of the crimes, had not been proven. But in order for her to make sure that she could allow for there to be a penalty verdict of life as opposed to death, she would go along and agree with and not perhaps apply the beyond a reasonable doubt standard as suggested in Dyer correctly and allowed for the determination of guilt and then made her position stand in the penalty phase. I guess the problem I'm having with the argument is that obviously it's speculative because we can't know. But we do have a determination by the state courts that whatever her bias was with regard to the death penalty, that it did not infect her ability to judge the guilt or innocence in the guilt phase. And under the EDPA deferential standard of review, don't you have to come forward with some evidence to convince us that that is a clear evidence? Or by clear and convincing evidence that that factual determination is wrong? I think that that determination, and I'm not sure that it's a factual determination because what they relied upon was Marshall in making the decision that there wasn't a violation. And Marshall didn't have anything to do with a juror that lied. It was a juror who brought into the jury deliberation room extraneous law. So I don't think that the foundation for any of the Court of Appeal and Supreme Court's opinion concerning whether or not this juror was biased or not biased has ground. But Mr. Thompson, even if it's a mixed question of law and fact, and I think you might be right about that, that it's not a pure factual question, you still have to come forward with something more than speculation in order to overcome the question of whether or not this juror was biased or not biased. And that's the deference that we otherwise are required by statute to give to the state court determination, don't you? And certainly the court is much more knowledgeable in this than I am, but I don't think so in the case in which the juror has lied. I mean, because that is a structural defect. Well, I guess that's the question. I mean, in other areas of law, a constitutional violation, if there was one, is subject to harmless error review. And in essence, I guess that's what the state courts did when they said, we don't see any evidence that it impacted her ability to be impartial in determining guilt or innocence. And again, though, that's relying upon cases, both the Marshall case relied upon by the state court, and then when it got to district court, relying upon Jones and Ross, which involved cases in which the juror could not have been excluded for cause based upon the reasons that they didn't tell the truth or didn't provide enough information. And I think that that's the difference, and I think that's why, to some extent, you kind of have to jump to Fulminante and the structural defect involved, because what you have, and one of the four kind of exceptions that the Fulminante court talks about is the impartial judge. If you have a case in which you have a partial judge or a judge that is biased, then that's a structural defect in which you don't have to prove the harm that occurred. You have a harmless error analysis. Now, Dyer and a number of the other cases, some of which are cited in the co-defendant's opening brief at page 13, Dyer, Estrada, and a few others, have held that this type of error, juror misconduct, is akin to the judicial bias that you would have if the judge wasn't partial, and therefore it is a structural defect that allows for the court to find that there's no need to prove harmless. I thought we've had, in fact, I think Judge Gould wrote a really fine opinion on juror misconduct where the juror brought in quotations from the Bible, and the court looked at whether or not that had an impact on deliberations from a harmless error standpoint. But that's a different situation. That's a juror who's bringing in something into the deliberation room that the court could analyze under a harmless error evaluation, like whether the confession was properly given. If the confession wasn't given, what would the result have been? But why doesn't that take us back to Judge Corman's question, and that is, if the jury did not return verdicts of death, and the bias by this particular juror was against the death penalty, can't we make that analysis and conclude that it wouldn't have impacted the guilt phase determination? The fact that she had a bias about the death penalty is not really the issue. The issue is that she lied to the court and to the parties about her position on anything. So any lie, and let's assume there was some question about a background or what her children did, and she, for whatever reason, told a lie that wasn't even material to any issue with the case, you would say that just because she lied, the conviction would have to be reversed? No, it has to be a material fact. It has to be a lie that if the truth had been told, she would have been excused for cause. So it can't just be any lie. But it would have been excused for cause because she wasn't impartial with regard to the penalty to be imposed, and she was excused before she deliberated on the penalty. That's correct. But because she lied, and I think that that really is the essence of this, because she lied, you cannot trust anything that she did during any part of the deliberation process. But how is that different? Suppose she had said during voir dire, I am, for religious reasons, fundamentally opposed to the imposition of the death penalty under any circumstances. Clearly the court would have excused her for cause because she would not be a fair and impartial juror  That's correct. But that doesn't say anything about whether or not she would be fair and impartial in determining whether the prosecution met its burden of proof beyond a reasonable doubt. Right, and we're not talking about this being a challenge to the death qualification process. But that is what the lie goes to. That is why that lie is material in a capital case. But the lie is material because of the fact that if she had told the truth, she could have been excused for cause. Even an excusal for cause might have been as often the result of a request by counsel to recuse for cause. Suppose she had told the truth, you, I mean not you, but the defense lawyer would have wanted her on the jury and would not have asked for the recusal for cause, and maybe the government would have. But my experience in the one death penalty case that I tried is that the defendant was always looking for jurors who could possibly be favorable to him on the death penalty side. And they would try and rehabilitate and they would say, oh, you could conceive of circumstances, can't you, where you might impose a death penalty. So this is a case where the defendant would have wanted this juror. And now you're asking for an automatic rule of reversal. The defendant might have wanted the juror if the juror's opinion about the death penalty had come at the beginning and had been told to everyone at the start. And there might have been a chance to rehabilitate. And I have tried I think 10 capital cases. I never wanted a lying juror. I wanted jurors that told me the truth. How do you square that with the record that shows that even after the evidentiary hearing where the misconduct was exposed, defense trial counsel objected to the court's removal for cause of juror number 11? I cited it in I think both the opening brief and the reply brief. At that point in time, defense counsel had no duty but to preserve the record. I mean that was his duty and I cited the ABA guidelines for that principle. But he didn't want the juror excused. Now whether he's doing it because he's trying to sew error into the record is a separate question. And the fact remains that he objected to the removal of the juror for cause at that point, knowing full well that she had not told the truth during voir dire. I don't think he was trying to sew error. I think he was trying to preserve error. You call it preserve. I'll accept your pejorative objection. He was just a competent lawyer who was doing a job not to preserve the record, but to keep a favorable juror on for the death penalty phase. That's the reason he objected. But at that point in time, the guilt had already been determined. But the guilt issue is over with and now he's looking at the situation where he has to present whatever he has to present to the best jury that he can get. If he now knows that this juror has in fact said, I am opposed to the death penalty, if he were not to have pursued her, I'm sure someone later on would have said, Counsel, I think you were probably ineffective under Strickland for not keeping that juror. Mr. Thompson, you wanted to be reminded when you were speaking. I will reserve the rest for rebuttal. Thank you very much. Your Honors, I want to focus on and really urge the court to take a careful look at uncertified issue D in Mr. Bouie's opening brief. That issue is requesting a remand so he gets a chance to fairly litigate the Batson issue. So you could skip over, frankly, uncertified issue C, which tries to argue the Batson issue on what we got here. There's a couple reasons I think Your Honors should look real carefully at that issue. First of all, you should be aware, and I think you will note from the record, that the underlying Batson issue was in the trial court's own words, quote, a close call, unquote, which, quote, troubled, unquote, her. So she even mused about the possibility of, well, gee, if a court of appeals reverses me, what might happen? Second, the issue as framed in uncertified issue D in our brief is really just about getting the tools to make the argument. It's really just about fair process. The court's ruling, if you think about it, on Mr. Bouie's Batson claim, was almost Kafkaesque. The attorney general argued, and the court ultimately ruled, that he lost on that claim because he had, quote, presented no evidence of any sort to support his claim of purposeful discrimination, unquote. But it never gave him access to what he needed to provide that evidence. It never, in the words of the Boyd v. Nolan case, gave him the tools. In this case, the tools, that evidence that he needed, were the juror questionnaires. Almost everything the prosecutor referred to in justifying the challenge was from the juror questionnaires. Almost everything the defense attorneys referred to in attacking the challenge was in the juror questionnaires. Almost everything the court referred to in ruling on the challenge was in the juror questionnaires. Didn't counsel have the juror questionnaires during voir dire? Yes, and that's why everybody was referring to them. And that's basically all they had, because the voir dire itself, per juror, was probably one or two pages. The questionnaires were at least 24 pages long. So as I read the record, maybe help me if I'm wrong, as I read the record, Batson Challenge is made, court conducts a sidebar or a mid-voir dire hearing in order to flesh that out. Batson Challenge is made, court conducts a sidebar or a mid-voir dire hearing in order to flesh that out. Prosecutor offers explanations which trial court credits. Isn't the fault here with trial counsel in not then offering evidence based on the questionnaires that were then available to him in order to rebut the, to establish pretext to show that those... that were then available to him in order to rebut the, to establish pretext to show that those... Well, but trial counsel tried to do that by also talking about the questionnaires. But still, on appeal, this court's case law is quite clear. In fact, Your Honor wrote an opinion, and I think it's one of the Lamarck cases where you refer to the nothing in a juror questionnaires multiple, multiple, multiple times. It is still appropriate, in fact, required for this court to do what they call a comparative juror analysis. And Mr. Bui, more important maybe, Mr. Bui, in his habeas petition, is entitled to try to do a comparative juror analysis. And the only way he could do that in this case is by having the juror questionnaires. I mean, the most fundamental, basic tool... Mr. Bui could not get them and does not have them. And one of the reasons is there's a California statute, and the record's a little ambiguous, but Mr. Bui, in his petition, cited two California statutes. One's Penal Code, I believe 95, or 95.2, something like that, that says basically a defendant, it's a misdemeanor to give them to a defendant. And then there's a Code of Civil Procedure section that's also cited in the petition that says the questionnaires will be sealed. It's a little ambiguous just what happened to them in this case, but it's clear in his petition that Mr. Bui is saying two things. One, I need the questionnaires, and two, as I understand it, the only way I can get them is by having an attorney who will try to get them for me. And that's why he made the request for counsel. And all we're asking for in Uncertified Issue D is that we either get discovery in the form of juror questionnaires, or I think more realistically, get an attorney for him so that attorney can get these juror questionnaires and do this comparative juror analysis, which it's crystal clear under this court's case law a defendant is entitled to do in his habeas petition. And to go back to your question, Judge Tallman, if what you're thinking is maybe the defense attorney in the middle of that trial, in the middle of the juror analysis, I don't think that's true. I think he can make the objections the way he made them, and then Mr. Bui is still entitled in his petition to do it. Mr. Gunn, I'm not so sure. I think our cases basically say that there is an... the burden never shifts. It's his motion to establish that the peremptories were exercised with a prejudicial motive. And he can't just stand mute when the prosecutor explains why he or she exercised the challenge, and then the court credits that explanation. The defense has to do something more at step three, which is to rebut what the prosecutor has said. That's correct, which the defense attorneys here clearly try to do. But there's no question that you can be doing this comparative juror analysis in the habeas context. There's a multitude of cases, including the one Your Honor was on, and three or four or five others, where this court in habeas is clearly doing that. One of the problems with this concept... The question would be whether or not the Supreme Court requires it. The fact that the Ninth Circuit thinks it's a good idea is all well and good, but that doesn't necessarily mean that the Supreme Court has commanded it. But the two Miller L. cases certainly do, and this court in the cases where it's done it, it's done it in ADBA cases, and it's applying Supreme Court precedent in the form of the two Miller L. cases, I think, versus Dred Keane versus Cockrell. You are out of time, and I'm going to give Mr. Thompson his three minutes. All right, I think I've covered what I wanted to. Thank you, Your Honor. Thank you, Mr. Gunn. We'll hear from the State. Good morning, Your Honors. Deputy Attorney General David Cook on behalf of Respondent. Good morning, Your Honor. Turning first to the juror misconduct question, I guess there's some terms being used in the discussion that are not being used in their precise context in this case. First of all, prejudice. Prejudice was assessed in the State Court of Justice. In the Marshall case, prejudice was discussed, but not prejudice in the usual harmless error type of way, Chapman or the State standard people v. Watson or even Brecht. The Marshall, the California Supreme Court in Marshall talked about prejudice as a matter of fundamental unfairness at the trial. In other words, more of a harmless error type of analysis. The California Supreme Court in Marshall cited Rose v. Clark, and so it was clear that the California Supreme Court was understanding of an issue of constitutional dimension. Am I wrong? I've always thought that structural error was a talisman that once established harmfulness, that it basically is a legal conclusion that the proceeding has been so infected by whatever the error is that you've been, as a matter of law, deprived of a fair trial no matter what the showing is, and you're entitled to a new trial. Isn't that what structural error means? Absolutely correct, Your Honor. Absolutely correct. And that brings me to the next point that's really used in a precise form here, and that is structure. And that has to do with the Greenwood test. The Greenwood test, even if we were to assume that this juror lied and had the statement, I'm not in favor of the death penalty, had that been mentioned during voir dire, even if we assumed that the juror lied, that that statement would have been the basis for an excusal for cause at voir dire, we still need to look at whether what the juror did or concealed affected the juror's impartiality. Greenwood itself was not a death penalty case. Greenwood was a civil case. So we have to look at Greenwood in the context of this case, which at the time of voir dire and at the time of the trial court's hearing regarding juror misconduct, we were in a penalty phase. I come back now to the term structure. The death penalty trial has a different structure than your typical criminal case or a civil case. And so the impartiality reference in Greenwood, in a non-AEDPA case of dire, in fields, in all of those other cases which cite Greenwood and the term impartiality, that term of impartiality has to be viewed in the context of this death penalty at the time case. As your honor pointed out during the opening remarks, the jurors bias toward the death penalty, but under clearly established United States Supreme Court authority in Witherspoon and Bumper, a juror's viewpoint about the death penalty in and of itself is not enough to taint or to establish a bias as to the guilt phase of the death penalty case. That's clearly established authority. Something more has to be done than speculate about the jurors views regarding the death penalty and how they would bear on the guilt phase. Let's assume she lied. Let's assume she would have been excused for cause. We still need to look at impartiality in the two separate procedures and see whether that impartiality affects the entire structure. It does not. My opposing counsel's argument, doing as good a job as possible on the record that is before us, but even your honor's comments and opposing counsel's comments are all speculative. We don't know why the juror did what she did. We don't know how whatever she concealed about her viewpoint about the death penalty bore on her ability to deliberate in the guilt phase. Without anything more clearly established, United States Supreme Court precedent would say that the impartiality of this trial. I would also like to point out that any fault at this stage for the lack of development of the record stands on the shoulders of trial counsel. At that time that the jurors alleged misconduct was being litigated in the hearing, not only did trial counsel argue against that juror's removal, argue for a mistrial for excusing that juror, but in the argument, I believe it was, I can't remember if it was Mr. Rowong's trial attorney or Mr. Bui's trial attorney, but argued that the guilt verdicts established her lack of bias. I cite to the record in the answering brief to Bui's appeal at page 29 for that purpose. Counsel Judge Gould, if I could ask you a question, please. Yes, your honor. Is there any Supreme Court precedent that says that a juror lying about a material issue in the case is a structural error? Not to my knowledge, your honor. In fact, we are all in agreement that Greenwood is a very, is one of the Supreme Court's greenwood decision. We have to go forward to say that the Supreme Court's greenwood decision is not the end of the analysis.  is not the end of the analysis. to see whether that response or concealment would have been a basis for cause and that the juror's belief bore on his or her impartiality. So to answer your honor's question, the answer is no, I am not aware of any such decision and we have greenwood here telling us exactly the opposite, that lying in and of itself is not enough. We have to go further than that. Okay, thank you. Your honors, I was not prepared to argue the Batson issue as it was uncertified. It has not been briefed by respondent in either of the briefs. And so I would ask if this court is inclined, I would prefer an opportunity to brief the issue before speaking on it. However, to the extent I would offer this, that to the extent opposing counsel wishes to develop facts that were not presented to the California courts, that would make the claim unexhausted, the petition mixed, and should be dismissed on that basis. Unless the court has any further questions, I would like to just close by saying the protections of the constitution are there to protect the defense, the defendant. He was protected in this case and at the moment where he could have sought exclusion of the juror for the basis he claims now, he didn't. He was satisfied at that point and at this point he should not be heard to complain about what he did at trial. Thank you, your honors. Anything further? No question. Thank you very much. With respect to the analysis of McDonough versus Greenwood that the state's counsel just provided, there is a two part test. The first part is that the juror must have misrepresented a material fact. That has to be done. And if the court, as the court did in this case, found that there had been such a misrepresentation. The second element, though, is simply that the material fact be of such consequence that it would allow for there to be a challenge for cause for that particular juror. And that is what occurred in this case. The correct response had the juror given that early on would have allowed for the court itself to excuse for cause or for the prosecutor or someone else to actually ask for the juror to be excused for cause. Both prongs were met in this case. Therefore, the Greenwood case, or McDonough versus Greenwood case, is the controlling case that the state court and that the district court should have looked at in providing its analysis. Dyer, just in response to some of the argument that was made with respect to the speculative nature of this type of claim, because it is a structural error or a structural defect in it, the harmless error analysis does not occur. But in Dyer, Judge Kaczynski went at great lengths to provide a number of items that could have happened with the particular juror that was excused in this case. I just referenced one of them, which is that a juror 11 could have walked to her own beat when considering the meaning of reasonable doubt. And that then draws this back to the issue of whether or not she could have been a fair and impartial juror in the guilt phase, which was, as the evidence shows, a close call. But I thought she was questioned on that point during Vaudier, along with all the other jurors. No. There were no questions that were asked of her regarding the death penalty during Vaudier. No, no, no, no. You were arguing about whether it would have impacted her ability to apply the standard of reasonable doubt to guilt or innocence. And, I mean, didn't she participate, along with all the other members, putative jurors, during Vaudier, on the questioning about the state's burden of proof and so on? The general question she was part of, and it did answer what she did. The problem is, is we have a juror that we cannot trust. Right. So did she lie? She lied on the other, and she didn't raise her hand when the court asked. Right. And I think that that's what the dire opinion is really about, is when you get to this point where you have a juror that you cannot trust, you cannot trust the juror at any stage. Thank you. Thank you very much. The case just argued is submitted. Thank you both counsels, or all counsel, for a very good argument.
judges: Korman, Gould, Tallman